1
2
3
4
5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

6
7

ERIC P. SOPTICH,

8                                  Plaintiff,

9            v.

10   HOWMEDICA OSTEONICS
     CORPORATION,

11                                  Defendant.

CASE NO. 2:19-cv-00744-RAJ-BAT

**REPORT AND
RECOMMENDATION**

12

13          Defendant Howmedica Osteonics Corporation ("HOC") moves, pursuant to Fed.R.Civ.P.

14   12(b)(6), to dismiss Plaintiff Eric Soptich's product liability claims. Dkt. 19. In his Amended

15   Complaint, Plaintiff alleges he was injured by a defective medical device used during spinal

16   fusion surgery. He asserts a common law negligence claim, and the following claims under the

17   Washington Product Liability Act ("WPLA"), RCW ch. 7.72: (1) design defect (RCW

18   7.72.030(1)(a)); (2) failure to warn/inadequate instructions (RCW 7.72.030(1)(b) & (c)); (3)

19   breach of implied warranty of fitness (RCW 7.72.030(2)); (4) negligence (RCW 7.72.030(1)); (5)

20   defective manufacture (RCW 7.72.030(2)(a)); and (6) negligent failure to maintain (RCW §

21   7.72.040(1)(a)). Dkt. 11, pp. 6-12.

22          HOC moves to dismiss Plaintiff's claims, except his "failure to warn/inadequate

23   instructions" claim and thus, that claim is not addressed here. HOC also moves, pursuant to

Fed.R.Civ.P. 12(f) to strike the exhibits attached to Plaintiff's Amended Complaint. Dkt. 19.

REPORT AND RECOMMENDATION- 1

The undersigned recommends that HOC's motion be granted in part, as to Plaintiff's common law negligence and implied warranty claims, and denied as to the remainder.

### FACTUAL ALLEGATIONS

In his First Amended Complaint[1], Plaintiff alleges that on November 3, 2016, Jens Chapman, M.D., performed a fusion back surgery on him at Swedish Hospital to correct his spinal stenosis. Dkt. 11, ¶ 6. During the surgery, Dr. Chapman attempted to place a Stryker AVS TL PEE Spacer between Plaintiff's L3 and L4 vertebrae. The Spacer (also referred to as a "Cage") is manufactured and marketed by HOC as a "Stryker" instrument. During the operation, Dr. Chapman used a Stryker AVS Space MIS Inserter ("Inserter") (Stryker Catalog No. 48389500) to insert the Spacer. The Inserter was also manufactured, owned, maintained, serviced, and marketed by HOC as a "Stryker" instrument specifically made to use in inserting the Cage. HOC brought the Inserter to Swedish Hospital for use by Dr. Chapman in Plaintiff's surgery. *Id.*, ¶ 7; Exhibit 1 (Instructions for Use of Cage and Inserter).

As Dr. Chapman was using the Inserter to insert the Cage between the two vertebrae, the Inserter "disassembled" from the Cage and the Cage snapped into Plaintiff's spinal cord. The Cage was removed with great difficulty and Dr. Chapman then had to use a different insertion device to place the Cage. Dkt. 11, ¶ 8. When the Cage snapped into his spinal cord, Plaintiff suffered a severe paraparesis injury, which left him confined to a wheelchair. *Id.*, ¶ 9.

Prior to Plaintiff's surgery, other physicians and health care providers had reported to HOC that the AVS Spacer Inserter had malfunctioned and had disengaged from the Cage.

---

[1] Plaintiff's original complaint was filed in state court and named Stryker as the only defendant. After removing the case here, Stryker moved to dismiss the complaint. Dkts. 1, 8. In response, Plaintiff amended his complaint and added HOC as a defendant. Dkt. 11. Pursuant to the parties' written stipulation and Rule 41(a)(1)(A)(ii), Stryker was then voluntarily dismissed. Dkt. 20.

REPORT AND RECOMMENDATION- 2

Reports were made to HOC in 2015, 2014, 2012, 2010, 2009 and 2008. According to Plaintiff, HOC came to the conclusion that improper maintenance of the Inserter was the cause of some of the malfunctions. *Id.*, ¶ 10 and Exhibit 2 (Copies of FDA Reports). A previous Inserter (Catalog No. 483329800), manufactured and marketed by HOC, was recalled due to design flaws, which were reported as "concerning fracture of handle, difficulty in removing inserter and inserter difficult to lock." Plaintiff alleges the recalled device is substantially similar to the device that caused him injury. *Id.*, ¶ 11, Exhibit 3.

The Inserter which caused Plaintiff's paraparesis is either a class I or a class II medical device under the Medical Device Act and as such, did not go through a FDA pre-market approval process prior to its manufacture and marketing in the United States. *Id.*, ¶ 12.

Plaintiff also alleges that Dr. Jens Chapman was unaware that the Inserter could malfunction and disassemble from the Cage, and that HOC did not alert Dr. Chapman to prior problems with the Inserter disassembling from the Cage. *Id.*, ¶13.

## DISCUSSION

### A.    Legal Standards

#### 1.    Rule 12(b)(6)

When considering a motion to dismiss under Rule 12(b)(6), the court construes the complaint in the light most favorable to the nonmoving party. *Livid Holdings, Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). Under Rule (8)(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 677-678 (2009). This does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id*., at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955 (2007).

To survive a motion to dismiss, a complaint must state sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id*. A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The *Twombly/Iqbal* standard is not a high one. *See Force v. Wright. Med. Tech., Inc.*, No. C12-5687RBL, 2012 WL 4897165, at *2 (W.D. Wash. Oct. 15, 2012); *Staub v. Zimmer*, No. C17-0508JLR, 2017 WL 2506166 at *2 (W.D. Wash. Oct. 15, 2012).

The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Wyler Summit Partnership v. Turner Broadcasting System, Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). A court may dismiss a complaint as a matter of law if it lacks a cognizable legal theory or states insufficient facts under a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

## 2.    Washington Product Liability Act ("WPLA"), RCW ch. 7.72

"[T]o state a claim under the WPLA, a plaintiff must plead non-conclusory allegations that plausibly support a claim for: (1) defective design; (2) failure to warn; (3) defective manufacture; or (4) breach of express or implied warranty." *Staub*, 2017 WL 2506166, at *2. Plaintiff's Amended Complaint cannot withstand this motion to dismiss unless it contains "sufficient non-conclusory factual allegations to support at least one avenue of relief." *Id.* "Simply alleging that" the defendant's product failed "does not create a plausible claim." *Force*, 2012 WL 4897165, at *2.

Although RCW 7.72.030 uses the term "negligence," strict liability is the applicable standard for a failure to warn or a design defect claim maintained under RCW 7.72.030(a) or (b). *Ayers*, 117 Wash.2d at 765, 818 P.2d 1337; *Soproni v. Polygon Apartment Partners*, 137

Wash.2d 319, 326–327, 971 P.2d 500 (1999) (citing *Falk*, 113 Wash.2d at 653, 782 P.2d 974).

However, for failure to warn claims involving a danger that becomes known after manufacture, a

negligence standard is applied. *Ayers*, 117 Wash.2d at 765, 818 P.2d 1337. A plaintiff may

establish liability by using either a risk-utility test or a consumer expectation test for both design

defect and failure to warn claims. *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117 Wash.2d

747, 818 P.2d 1337 (1992) (en banc) (failure to warn claim); *Falk v. Keene Corp.*, 113 Wash.2d

645, 782 P.2d 974 (1989) (en banc) (design defect claim).

The WPLA "created a single cause of action for product-related harms and supplants

previously existing common law remedies, including common law actions for negligence."

*Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 858 P.2d 1054, 1067 (Wash. 1993).

**B.    Design Defect – RCW 7.72.030(1)(a)**

As previously stated, a design defect claim can be based upon either a "risk utility test" or

a "consumer expectations test" theory. *See, e.g.*, *Kirkland v. Emhart Glass S.A.*, 805 F. Supp. 2d

1072, 1080 (W.D. Wash. 2011); *Falk*, 782 P.2d at 980. Under the risk utility test theory, a

plaintiff may prevail by proving that, "at the time of manufacture, the likelihood that the product

would cause the plaintiff's harm or similar harms, and the seriousness of those harms, outweighs

the manufacturer's burden to design a product that would have prevented those harms and any

adverse effect a practical, feasible alternative design would have on the product's usefulness."

*Falk*, 782 P.2d at 980 (citing RCW 7.72.030(1)(a)). Under the consumer expectations test theory,

a plaintiff may prove a defendant's liability by showing the product was unsafe to an extent

beyond that which the ordinary consumer would contemplate. *Id.* (citing RCW 7.72.030(3)).

Also as previously stated, strict liability is the applicable standard for a failure to warn or

a design defect claim maintained under RCW 7.72.030(a) or (b). In its motion to dismiss, HOC

REPORT AND RECOMMENDATION- 5

argues that strict liability is unavailable in this case because the Inserter is an unavoidably unsafe

medical product. HOC relies heavily on *Transue v. Aesthetech Corp.*, 341 F.3d 911 (9th Cir.

2003), for this proposition. Plaintiff counters that the Inserter specifically lacks the requisite

characteristics of an "unavoidably unsafe product," as it was not being used under the

prescription of a physician, nor did it "have a high risk of possible harmful effects." Instead, this

was a relatively routine surgery utilizing a simple surgical instrument –one which could certainly

be made to not "disassemble" during surgery.

Restatement (Second) of Torts section 402A comment *k* establishes an exception to strict

liability for "unavoidably unsafe products" such as prescription drugs and medical devices. *Ruiz–

Guzman v. Amvac Chem. Corp.*, 141 Wash.2d 493, 505–06, 7 P.3d 795 (2000) (citing *Terhune v.

A.H. Robins Co.*, 90 Wash.2d 9, 12, 577 P.2d 975 (1978)). The comment *k* exception applies to

medical products that have a high risk of possible harmful effects but are "necessary regardless

of the risks involved to the user." *Rogers v. Miles Labs., Inc.*, 116 Wash.2d 195, 204, 802 P.2d

1346 (1991). Comment *k* reads as follows:

> k.  Unavoidably unsafe products. There are some products which, in the present
> state of human knowledge, are quite incapable of being made safe for their
> intended and ordinary use. These are especially common in the field of drugs. An
> outstanding example is the vaccine for the Pasteur treatment of rabies, which not
> uncommonly leads to very serious and damaging consequences when it is
> injected. Since the disease itself invariably leads to a dreadful death, both the
> marketing and the use of the vaccine are fully justified, notwithstanding the
> unavoidable high degree of risk which they involve. Such a product, properly
> prepared, and accompanied by proper directions and warning, is not defective, nor
> is it unreasonably dangerous. The same is true of many other drugs, vaccines, and
> the like, many of which for this very reason cannot legally be sold except to
> physicians, or under the prescription of a physician. It is also true in particular of
> many new or experimental drugs as to which, because of lack of time and
> opportunity for sufficient medical experience, there can be no assurance of safety,
> or perhaps even of purity of ingredients, but such experience as there is justifies
> the marketing and use of the drug notwithstanding a medically recognizable risk.
> The seller of such products, again with the qualification that they are properly
> prepared and marketed, and proper warning is given, where the situation calls for

REPORT AND RECOMMENDATION- 6

> it, is not to be held to strict liability for unfortunate consequences attending their
> use, merely because he has undertaken to supply the public with an apparently
> useful and desirable product, attended with a known but apparently reasonable
> risk.

Rest. (2d) Torts § 402A cmt. *k* (1965). The rationale underlying the comment *k* exception is that the social utility of having certain products available outweighs the risk posed by their use. *See*, *Rogers*, 116 Wash.2d at 204, 802 P.2d 1346. As was recently explained by the Washington Supreme Court, "[w]here a product is inherently dangerous by nature but is still desirable because of its public benefit, it is an 'unavoidably unsafe product' under comment *k*. Comment *k* exempts such product from strict liability under § 402A." Additionally, "comment *k* provides that a product is 'unavoidably unsafe' only when it is otherwise properly prepared and accompanied by adequate warnings; thus, the exception applies only after the trier of fact determines that the prerequisites have been met." *Taylor v. Intuitive Surgical, Inc.*, 187 Wn.2d 743, 766, 389 P.3d 517 (2017) (comment *k* is not available to a manufacturer that fails to adequately warn).

The type of products which have been thus far deemed unavoidably safe by the Washington Supreme Court include medical products available only through a physician, *i.e.*, the Dalkon Shield (an implanted contraceptive device) (*Terhune*, 90 Wash.2d at 13–14, 577 P.2d 975); the processing and supplying of blood and blood products (*Rogers*, 116 Wash.2d at 197, 802 P.2d 1346); and prescription drugs (*Young*, 130 Wash.2d at 181, 922 P.2d 59). *See also*, *Transue*, 341 F.3d 911 (silicone breast implants).

In *Ruiz-Guzman*, the Washington Supreme Court held that "[b]y its own terms, comment *k* is especially applicable to medical products. The exceptions for medical products recognize the unique protection provided to the consumers of such products by the prescribing physician (and/ or pharmacist) intermediary." 141 Wash.2d at 508. This rationale emphasizes the presence of

REPORT AND RECOMMENDATION- 7

physicians as intermediaries between manufacturers and consumers, and recognizes that "[a] physician possesses the medical training to assess adverse health effects of a medical product and to tailor that assessment to a particular patient." *Id*.

"It is on this rationale that the *Ruiz–Guzman* court distinguished the applicability of comment *k* to pesticides from medical products. The *Ruiz–Guzman* court held that, for pesticides, the determination of whether the product is 'necessary regardless of the risks'" should be done on a product-by-product basis ['as opposed *to a blanket exemption like that for medical products.*'] *Transue*, 341 F.3d at 917 (quoting *Ruiz-Guzman*, 141 Wash.2d at 509-510, 7 P.3d at 803) (emphasis added).

The Ninth Circuit in *Transue* relied on the foregoing dicta (in brackets above) in *Ruiz-Guzman* to conclude that the Washington Supreme Court was expressing its belief that "all medical products receive blanket *k* exemption." *Transue*, 341 F.3d 911, 916 (9th Cir. 2003).[2] Thus, HOC argues that its Inserter, which is a medical device, should receive that same blanket exemption from strict liability. The argument fails for several reasons.

First, *Transue* stands for the proposition that comment *k* to Restatement (Second) of Torts Section 402A creates a "blanket exemption from strict liability" for medical products, which pursuant to Section 402A are those that are "unavoidably unsafe" or otherwise only available

---

[2] The Ninth Circuit noted that this blanket comment k exemption for medical products is not found in all states, there is a split in the jurisdictions, and the rules in Washington, California, and Utah are in the minority. *See, e.g.*, *Brown v. Superior Court*, 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988); *Grundberg v. Upjohn Co.*, 813 P.2d 89 (Utah 1991); *Young*, 130 Wash.2d 160, 922 P.2d 59. The majority view, the case-by-case, product-by-product analysis, has been adopted in several other states. *See, e.g.*, *Tobin v. Astra Pharm. Prods., Inc.*, 993 F.2d 528 (6th Cir.1993); *Hill v. Searle Labs.*, 884 F.2d 1064 (8th Cir.1989); *Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775 (R.I.1988); *Toner v. Lederle Labs.*, 112 Idaho 328, 732 P.2d 297 (1987); *Feldman v. Lederle Labs.*, 97 N.J. 429, 479 A.2d 374 (1984). *Transue*, 341, F.3d at 916, n.2.

REPORT AND RECOMMENDATION- 8

"under the prescription of a physician" and only concerns "medical devices that have a high risk of possible harmful effects but are 'necessary regardless of the risks involved to the user.'" *See* cmt. *k* to Restatement (Second) of Torts Section 402A; *see also Payne v. Paugh*, 190 Wn.App. 383, 405, 360 P.3d 39 (2015) (quoting *Rogers*, 116 Wn.2d at 204, 802 P.2d 1346 (1991)). After determining that the Washington Supreme Court in *Ruiz-Guzman* expressed its belief that all medical products receive blanket comment *k* exemption, the Ninth Circuit then went on to determine whether the silicone breast implants at issue, were in fact, "specifically, [] a 'medical device or product.'" *Id.*

As the Washington Supreme Court in *Ruiz-Guzman* explained, the type of products that are "unavoidably unsafe" are "not products that ever could be 'reasonably safe as designed.'" *Ruiz–Guzman*, 141 Wash.2d at 506, 7 P.3d 7959 (quoting RCW 7.72.030(1)). Unlike drugs, blood, or implanted medical devices, the Inserter is a tool used to hold the product (the Cage) that is being implanted –Plaintiff alleges the Inserter was specifically designed to hold the Cage while the Cage is being inserted and that the Inserter "disassembled" during use, causing the Cage to fall from the Inserter and strike his spinal cord.

The type of medical products or devices that the Washington Supreme Court has to date concluded are "unavoidably unsafe" are products or devices that are implanted, injected, or ingested by the patient, *i.e.* an implanted contraceptive device (*Terhune*, 90 Wash.2d at 13–14, 577 P.2d 975); blood and blood products (*Rogers*, 116 Wash.2d at 197, 802 P.2d 1346); and prescription drugs (*Young*, 130 Wash.2d at 181, 922 P.2d 59). In *Transue*, which involved a silicone breast implant, the Court noted that some federal circuits, including the Ninth Circuit, have treated *implanted* medical products and devices as falling under the comment *k* exception. *Transue*, 341 F.3d at 917, n.3 (citing *Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1337 (9th

Cir.1985) (applying comment *k* to case involving an intrauterine device); *Brooks v. Medtronic, Inc.*, 750 F.2d 1227, 1230–31 (4th Cir.1984) (applying comment *k* to case involving a cardiac pacemaker). *See also*, *Artiglio v. Superior Court*, 22 Cal.App.4th 1388, 1395, 27 Cal.Rptr.2d 589 (Cal.App. 4 Dist. 2001) (rule immunizing manufacturers of prescription drugs and penile implants from strict liability for design defects "applies equally to breast implants. Just as drugs are injected or ingested into the body, a breast implant, as a penile prosthesis, is 'plugged in' to the individual."); *Hufft v. Horowitz*, 4 Cal.App.4th 8, 19–20, 5 Cal.Rptr.2d 377 (1992) (analogizing implanted medical devices to prescription drugs, as opposed to products such as wheelchairs, and concluding by "draw[ing] a bright line within which the comment *k* test is applied to all implanted medical devices."); *Plenger v. Alza Corp.*, 11 Cal.App.4th 349, 360–61, 13 Cal.Rptr.2d 811 (1992) (applying comment k to an implanted intrauterine device).

Under this reasoning then, the Inserter, which is intended to hold the Cage, would not fall under the comment *k* exception to strict liability because it is not implanted and there is nothing to indicate that the Inserter itself, "in the present state of human knowledge, [is] quite incapable of being made safe for [its] intended and ordinary use."

Accordingly, the undersigned recommends that HOC's motion to dismiss Plaintiff's design defect claim on this basis be denied. Alternatively, if the District Court were to find that the Inserter is an inherently dangerous product so that the negligence standard applies to Plaintiff's design defect claim, the undersigned recommends that Plaintiff be allowed to pursue his design defect claim under a negligence theory as he has sufficiently stated such a claim. *See, e.g., Transue*, 341 F.3d at 917-18; *Young*, 922 P.2d at 63 ("When a manufacturer of an unavoidably unsafe product fails to adequately warn of its inherent dangers, [comment *k*] imposes liability only for negligence, not strict liability."). Plaintiff alleges HOC was negligent,

REPORT AND RECOMMENDATION- 10

1   in that it had a continuing duty to monitor its product and to discover and report any adverse

2   health consequences; HOC had prior knowledge of the problems with the Inserters (*i.e.*, that they

3   were prone to disassembling during surgery); HOC failed to change the design of the Inserter so

4   that it would have a reliably safe means of attachment (such as a screw/thread attachment that

5   would completely remove the risk of detachment), and HOC's failure to design a safer

6   alternative was the proximate cause of his injuries. *See e.g.*, Dkt. 11, ¶¶ 18-20; 22; 30-33. From

7   these allegations, a jury could reasonably determine that HOC's failure to design a safer product

8   was negligence. Because Plaintiff has adequately pled such a claim, the undersigned

9   recommends, in the alternative, that he be allowed to pursue his design defect claim under a

10  negligence theory of liability.

11  **C.     Breach of Implied Warranty (Strict Liability) – RCW 7.72.030(2)**

12           Plaintiff brings an implied-warranty claim under the WPLA. Dkt. 11, ¶ 24–29. He alleges

13  that HOC knew of the particular purpose for which the Inserter would be used because it sold the

14  Inserter for the express purpose of placing a Cage between vertebrae; HOC impliedly warranted

15  the Inserter was fit for the purpose of inserting a Cage; Plaintiff and his doctor relied on HOC's

16  skill and judgment and the implied warranty of fitness; the Inserter was not fit for its intended

17  use because it disassembled from the Cage; and HOC's breach of the implied warranty of fitness

18  proximately caused Plaintiff's injuries and damages. Dkt. 11, ¶¶ 24-29.

19           HOC contends these allegations are insufficient because Plaintiff has failed to allege

20  privity and did not purchase the Inserter at issue. HOC also argues that comment *k*'s exception to

21  strict liability bars UCC-based implied warranty claims involving medical products. Plaintiff

22  argues that privity is not required and relies on statutory language and legislative history in

23  support. For example, Plaintiff refers to section 7.72.010(5) of the WPLA, which states that "a

REPORT AND RECOMMENDATION- 11

1   claim may be asserted under this chapter even though the claimant did not buy the product from,

2   or enter into any contractual relationship with, the product seller." Dkt. 22, at 9 (citing RCW

3   7.72.010(5); *Washington Water Power Co. v. Graybar Elec. Co.*, 774 P.2d 1199, 1202 (1989).

4   The issue is not, however, whether Plaintiff has standing to assert any products liability claim

5   under the WPLA but rather, whether he may bring the specific claim of breach of an implied

6   warranty without first showing privity.

7           Under the WPLA, "a product manufacturer is subject to strict liability to a claimant if the

8   claimant's harm was proximately caused by the fact that the product was … not reasonably safe

9   because it did not conform to the manufacturer's express warranty *or to the implied warranties*

10  *under Title 62A RCW*." *See* RCW 7.72.030(2) (emphasis added); RCW § 62A.2-315. Thus,

11  "[w]hether or not a product conforms to an implied warranty created under Title 62A RCW shall

12  be determined under that title." RCW 7.72.030(2)(c). Generally, contractual privity between the

13  buyer and seller must exist before a plaintiff may maintain an action for a breach of warranty.

14  *Baughn v. Honda Motor Co., Ltd.*, 107 Wash.2d 127, 151, 727 P.2d 655 (Wash. 1986). This

15  requirement is relaxed if the manufacturer makes express representations in advertising, or in

16  some other form, to the plaintiff. *Id*. at 151–52, 727 P.2d 655. "Recovery for breach of an

17  express warranty is contingent on a plaintiff's knowledge of the representation." *Touchet Valley*

18  *Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wash.2d 334, 347, 831 P.2d 724

19  (1992) (citing *Baughn*, 107 Wash.2d at 151-152, 727 P.2d at 669); *see also*, *Tex Enterprises, Inc.*

20  *v. Brockway Standard, Inc.*, 149 Wash. 2d 204, 66 P.3d 625, 50 U.C.C. Rep. Serv. 2d 317 (2003)

21  (purchaser of steel containers could not maintain claim against manufacturer where purchaser

22  lacked privity or status as third-party beneficiary); *Thongchoom v. Graco Children's Products,*

23  *Inc.*, 117 Wash. App. 299, 71 P.3d 214 (Div. 3 2003) (trial court properly dismissed claim for

REPORT AND RECOMMENDATION- 12

1   breach of implied warranty because the plaintiffs had received an allegedly defective baby

2   walker as a gift and could not establish an implied representation accompanying the purchase of

3   a product). Additionally, for there to be recovery on a breach of an implied warranty, the plaintiff

4   must have purchased something. *Thongchoom*, 117 Wash.App. at 308, 71 P.3d at 219 (citing

5   *Baughn*, 107 Wash.2d at 151, 727 P.2d 655); *see also*, *McFarland v. APP Pharm.*, LLC, C10-

6   1746RSL, 2011 WL 5507209, at *4 (W.D. Wash. Nov. 8, 2011) ("Because Plaintiffs fail to

7   allege privity, they do not adequately plead an implied warranty claim."); *Stepp v. Takeuchi Mfg*

8   *Co. (U.S.) Ltd.*, C07-5446RJB, 2008 WL 4460268, *11 (W.D. Wash. Oct. 2, 2008) (granting

9   summary judgment on a WPLA claim due to a lack of privity)

10         HOC also argues that comment *k*'s exemption to strict liability bars UCC-based implied

11   warranty claims involving medical products. Dkt. 19, p. 10, ¶¶ 12-13. For the reasons previously

12   discussed, the undersigned disagrees that a blanket comment *k* exemption applies to all medical

13   products without regard to whether those products are unavoidably unsafe. In addition, the Ninth

14   Circuit warned in *Transue* that the term "blanket exemption" has been used in two ways, one of

15   which is misleading:

16         First, to argue that all medical devices and products are exempted from strict
           liability by virtue of comment *k*; and second, to argue that the exemption is

17         "blanket" with respect to a manufacturing defect, a design defect, and a failure to
           adequately warn, and that there is no strict liability claim for any of these three

18         categories in the case of a medical device or product.... [W]hile all medical
           devices or products are unavoidably unsafe, and therefore receive blanket

19         exemption," this exemption applies only to the design defect claim of the
           traditional three-category products liability claim....

20   341 F.3d at 916 n.1; *see id*. at 917-19 (discussing why comment *k* does not apply to

21   manufacturing defect claims). In other words, while the comment *k* exception may be applied to

22   all unavoidably unsafe medical products, it will not be applied with respect to all strict liability

23

REPORT AND RECOMMENDATION- 13

1    claims arising from their use. Thus, HOC's motion to dismiss Plaintiff's breach of implied

2    warranty claim on this basis should be denied.

3          Because Plaintiff does not allege facts establishing privity and offers no basis for relaxing

4    the privity requirement, the undersigned recommends that HOC's motion to dismiss his claim for

5    breach of implied warranty be granted.

6    **D.     Common Law Negligence and Negligence Under RCW 7.72.030(1) (¶¶ 30-33)/**
             **Negligent Failure to Maintain (¶¶38-41)**

7          Defendant contends that Plaintiff's negligence claims are preempted by the WPLA. Dkt.

8    19, pp. 5-6; *see* Dkt. 11, ¶¶ 30–33; ¶¶ 38-41. Defendant further argues that there is no "negligent

9    failure to maintain" claim in Washington.

10        **1.     Common Law and Statutory Negligence**

11         Plaintiff alleges that HOC was negligent because it failed to use reasonable care in the

12   testing, inspecting, and manufacturing of the Inserter and negligently failed to alert surgeons like

13   Dr. Chapman that the Inserter could disengage from the Case. Dkt. 11, ¶¶ 31-33. Plaintiff asserts

14   that "[t]his negligence was a proximate cause of injury to the plaintiff, rendering defendants

15   liable *under both common law and RCW 7.72.030(1). Id.*, ¶ 33 (emphasis added).

16         RCW 7.72.030(1) provides:

17         (1) A product manufacturer is subject to liability to a claimant if the claimant's
           harm was proximately caused by the negligence of the manufacturer in that the
           product was not reasonably safe as designed or not reasonably safe because
           adequate warnings or instructions were not provided.

18         Thus, Plaintiff's negligence under RCW 7.72.030(1) is specifically authorized under the

19   WPLA and is adequately pled. As to Plaintiff's "common law negligence" claim, that claim

20   should be dismissed because it is preempted by the WPLA. "The WPLA creates a single cause of

21   action for product-related harms that supplants previously existing common law remedies,"

REPORT AND RECOMMENDATION- 14

including common law action for negligence. *Wash. State Physicians Incs. Exchange & Ass'n v. Fisons Corp.*, 858 P.2d 1054, 1067 (Wash. 1993); *Washington Water Power Co. v. Graybar Electric Co.*, 774 P.2d 1199, 1207, amended, 779 P.2d 697 (Wash. 1989); *see also Bylsma v. Burger King Corp.*, 293 P.3d 1168, 1170 (Wash. 2013). The question of preemption turns on whether a negligence claim seeks "remedies for product-related harms." *Wash. State Physicians*, *id*. at 1066. "[T]he WPLA means nothing if it does not preempt common law product liability remedies." *Graybar*, 774 P.2d at 1203.

Plaintiff's common law negligence claim (see Dkt. 11, ¶¶ 30–33, 38–41) is a product liability claim, as that term is defined in the WPLA. *See* RCW § 7.72.010(4). "Insofar as a negligence claim is product-based, the negligence theory is subsumed under the WPLA product liability claim." *Macias v. Saberhagen Holdings, Inc.*, 282 P.3d 1069, 1074 (Wash. 2012). Being "preempted" by the WPLA, Plaintiff's common law negligence claim fails as a matter of law, and the undersigned recommends that it be dismissed.

### 2. Negligent Failure to Maintain

In paragraphs 38-41 of his Amended Complaint, Plaintiff alleges that HOC serviced and maintained the Inserter, delivered the Inserter to Dr. Chapman, negligently and improperly maintained the Inserter by failing to either retire a worn out or broken Inserter or by failing to properly service the Inserter, and that this negligence caused the Inserter to fail and caused Plaintiff's paraplegia. Dkt. 11, ¶¶ 38-39. Plaintiff further alleges that HOC knew that improperly serviced or worn out inserters could disassemble and potentially cause injury to patients because they had received complaints of prior incidents. *Id.*, ¶ 40.

Under the WPLA, a "'product seller' means any person or entity that is engaged in the business of selling products, whether the sale is for resale, or for use or consumption… The term

REPORT AND RECOMMENDATION- 15

1   includes a manufacturer, wholesaler, distributor, or retailer of the relevant product. The term also

2   includes a party who is in the business of leasing or bailing such products." RCW § 7.72.010(1).

3   A product seller other than a manufacturer is liable to the claimant only if the claimant's harm

4   was proximately caused by: (a) the negligence of such product seller…" RCW § 7.72.040(1)(a).

5   Plaintiff alleges that HOC is both the product manufacturer and the product seller, as those terms

6   are defined in the WPLA. HOC argues that because it is alleged to be both the manufacturer and

7   the product seller, its liability, if any, must be based on RCW § 7.72.030 rather than RCW §

8   7.72.040. *See Swartwood v. Fun-Tastic Shows Inc.*, C17-5971 BHS, 2019 WL 1777728, at *2

9   (W.D. Wash. Apr. 23, 2019) (outlining the WPLA's various "paths to liability").

10       Plaintiff has alleged that HOC is both the manufacturer and seller of the Inserter and that

11   HOC "negligently and improperly maintained" the Inserter at issue and knew that its failure to

12   do so could cause the Inserter to disassemble and cause injury. The undersigned finds that this

13   claim is sufficiently alleged. If in fact, Plaintiff has improperly cited to the WPLA, he should be

14   allowed to amend his complaint to properly plead the theory of liability that matches his

15   allegation of negligence.

16       Additionally, HOC's argument that Washington does not recognize a "failure to

17   maintain" cause of action is misplaced as Plaintiff clearly alleges this claim for negligence

18   pursuant to the WPLA. Accordingly, the Court recommends that HOC's motion to dismiss this

19   claim be dismissed.

20   **E.    Defective Manufacturer/Strict Liability Under RCW 7.72.030(2)(a)**

21       The WPLA, in RCW § 7.72.030(2)(a) & (3) sets forth the following standards for

22   proving a manufacturing defect claim:

23       A product manufacturer is subject to strict liability to a claimant if the claimant's
         harm was proximately caused by the fact that the product was not reasonably safe

REPORT AND RECOMMENDATION- 16

> in construction… A product is not reasonably safe in construction if, when the product left the control of the manufacturer, the product deviated in same material way and from the design specifications or performance standards of the manufacturer, or deviated in some material way from otherwise identical units of the same product line… In determining whether a product was not reasonably safe under this section, the trier of fact shall consider whether the product was unsafe to an extent beyond that which would be contemplated by the ordinary consumer.

RCW § 7.72.030(2)(a) & (3). In order to survive a CR 12(b)(6) motion, a Plaintiff must "explain or identify how the product deviated from the intended result or design, or from other seemingly identical models." *Staub*, 2017 WL 2506166 at *4.

Plaintiff alleges that the Inserter attached to the Cage with pincers or ears, which was not a reliably safe means of attachment as evidenced by prior incidents where it had become disassembled. Dkt. 11, ¶ 17. Plaintiff alleges other practical and feasible methods of attaching the Inserter to the Cage were available and known to HOC, such as using a rotating screw/thread attachment, which would not impede the Inserter's usefulness. *Id.*, ¶ 18. Plaintiff specifically alleges that the Inserter that caused him injury was not reasonably safe in construction in that when the product left HOC's control, the Inserter had defective or worn pincers or ears – which deviated in a material way from HOC's design specifications or performance standards. *Id.*, ¶ 35. Plaintiff also alleged that his surgeon was able to complete the surgery by using a different Inserter and Spacer from the same product line (*Id.*, ¶ 8), which evidences that the original Inserter deviated in a material way from an identical unit of the same product line because the second Inserter did not become disassembled from the Spacer and cause Plaintiff further injury.

Taking these allegations as true, as the Court must do at this stage of the litigation, the undersigned finds Plaintiff has sufficiently explained or identified how the product at issue deviated from the intended result or design, or from other seemingly identical models. Accordingly, it is recommended that HOC's motion to dismiss this claim be denied.

REPORT AND RECOMMENDATION- 17

**F.    Motion to Strike Attached Exhibits**

Defendant moves to strike exhibits attached to Plaintiff's Amended Complaint. HOC argues that the exhibits should be stricken because they are prejudicial, unduly lengthy, evidentiary in character, and are not "written instruments" as defined by Rule 10(c). Dkt. 19, pp. 16-21. Plaintiff attached three exhibits to his Amended Complaint: (1) "Instructions for Use" of the Inserter; (2) twelve reports regarding similar Inserter failures from November 2008 through November 2015; and (3) a FDA recall notice of an earlier version Inserter. Dkt. 11, Exhibits 1-3.

"Motions to strike are generally viewed with disfavor and are not frequently granted." *Lazar v. Trans Union, LLC*, 195 F.R.D. 665, 669 (C.D.Cal.2000). Such motions "are often looked on with disfavor because of the tendency for such motions to be asserted for dilatory purposes." *State of California ex rel. State Lands Comm'n v. United States*, 512 F.Supp. 36, 38 (N.D.Cal.1981). Conversely, "where the motion may have the effect of making the trial of the action less complicated, or have the effect of otherwise streamlining the ultimate resolution of the action, the motion to strike will be well taken." *Id.*; *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir.1993), *overruled on other grounds*, 510 U.S. 517 (1994).

The district court "may strike from a pleading ... any redundant, immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). "Redundant" matter is that which "consists of allegations that constitute a needless repetition of other averments or which are wholly foreign to the issue to be denied." *Gilbert v. Ely Lilly & Co.*, 56 F.R.D. 116, 120 n. 4 (D.Puerto Rico 1972). "By 'immaterial' matter, it is generally meant that which has no essential or important relationship to the claim for relief or the defenses being pleaded." *Id.* at 120 n. 5; *Fantasy*, 984 F.2d at 1527. "Impertinent" matter is that which "consists of any allegation not responsive nor relevant to the issues involved in the action and which could not be put in issue or be given in

REPORT AND RECOMMENDATION- 18

1  evidence between the parties." *Gilbert*, 56 F.R.D. at 120 n. 6; *Fantasy*, 984 F.2d at 1527.

2  "Superfluous historical allegations, are [also] a proper subject of a motion to strike." *Fantasy*,

3  984 F.2d at 1527.

4        "Courts must view the pleadings under attack in the light more favorable to the pleader,"

5  and motions to strike "are generally not granted unless it is clear that matter to be stricken could

6  have no possible bearing on the subject matter of litigation." *Lazar*, 195 F.R.D. at 669 (citation

7  omitted). Motions to strike thus "should not be granted" absent "a demonstration that the

8  allegations attacked have no possible relation to the controversy, and may prejudice the other

9  party." *Gilbert*, 56 F.R.D. at 120–21 (D.Puerto Rico 1972); *Lazar*, 195 F.R.D. at 669.

10       HOC is correct that evidentiary allegations are not usually proper pleading, but those

11  "supplying background or historical material or other matter of an evidentiary nature, will not be

12  stricken unless unduly prejudicial to" defendants. *LeDuc v. Kentucky Central Life Insurance Co.*,

13  814 F.Supp. 820, 830 (N.D.Cal.1992) (internal citations omitted). Therefore, where those

14  allegations, "when read with the complaint as a whole, give a full understanding thereof, they

15  need not be stricken." *Id.* "Under the liberal federal pleading rules," furthermore, "notice and

16  clarity of claims is all that is required." *Id.* "Neither a district court nor an appellate court should

17  decide to strike a portion of the complaint on the grounds that the material could not possibly be

18  relevant on the sterile field of the pleadings alone." *Lipsky v. Commonwealth United Corp.*, 551

19  F.2d 887, 893 (2d Cir. 1976).

20       The exhibits attached to the Amended Complaint are not redundant, immaterial,

21  impertinent or scandalous. They are material as they provide information on the product

22  involved, similar product failures, and recall of a prior version of the product involved. Thus, the

23  exhibits serve to provide the Court with a fuller understanding of the allegations contained in the

Amended Complaint.

REPORT AND RECOMMENDATION- 19

HOC fails to show how or why the exhibits will unduly prejudice it. The question of whether the exhibits are ultimately admissible, is a question better left to a later stage in this litigation, after the parties have engaged in discovery. Should Plaintiff wish to utilize any of the exhibits, he will need to present them at the appropriate time in the litigation with an appropriate motion. At that time, the Court can address any objections to their admissibility. *See*, *e.g.*, *Parmelee v. Dunnington*, No. C11-5771 RBL/KLS, 2012 WL 527522, at *2 (W.D. Wash. Feb. 16, 2012) ("[I]f and when this action does reach an appropriate stage in litigation for the submission of evidence, Plaintiff will not be able to refer to exhibits attached to his complaint as evidence.")

Finally, while the exhibits are lengthy, they do not make it difficult to determine just what circumstances allegedly gave rise to the various causes of action. The Amended Complaint contains a short and plain statement of Plaintiff's claims, and references the exhibits where appropriate. Accordingly, the Court recommends that HOC's motion to strike the exhibits attached to Plaintiff's Amended Complaint be denied.

## CONCLUSION

The undersigned recommends that the Court grant HOC's motion to dismiss (Dkt. 19) in part as to Plaintiff's common law negligence and implied warranty claims, and deny the remainder of the motion.

## OBJECTIONS AND APPEAL

This Report and Recommendation is not an appealable order. Therefore a notice of appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the assigned District Judge enters a judgment in the case.

Objections, however, may be filed and served upon all parties no later than **August 27, 2019.** The Clerk should note the matter for **August 29, 2019**, as ready for the District Judge's consideration if no objection is filed. If objections are filed, any response is due within 14 days

REPORT AND RECOMMENDATION- 20

after being served with the objections.  A party filing an objection must note the matter for the Court's consideration 14 days from the date the objection is filed and served.  The matter will then be ready for the Court's consideration on the date the response is due.  Objections and responses shall not exceed eleven (11) pages.  The failure to timely object may affect the right to appeal.

DATED this 6th day of August, 2019.

BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

REPORT AND RECOMMENDATION- 21